**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PHILLIP A. HESS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:05CV02195MLM** |
| | ) | |
| **SANOFI-SYNTHELABO INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Before the court is the Motion for Summary Judgment filed by Defendant Sanofi-Synthelabo, Inc. ("Defendant"). Doc. 16. Plaintiff Phillip Hess ("Plaintiff") filed a Response. Doc. 20. Defendant filed a Reply. Doc. 21. Also before the court is Plaintiff's Motion to Supplement Memorandum in Opposition to Motion for Summary Judgment. Doc. 25. Defendant filed a Response to Plaintiff's Motion. Doc. 26. Plaintiff filed a Reply. Doc. 27. The parties presented oral argument to the court on January 19, 2006. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Doc. 8.

## UNDISPUTED FACTS[1]

Defendant is a pharmaceutical company that is involved in the promotion and sale of pharmaceutical products for a wide range of medical conditions. It typically sells products directly to drug wholesalers rather than health care professionals or pharmacies. Defendant's sales representatives do not "book orders" for drugs. Defendant's sales representatives are responsible for

---

[1] The facts are undisputed unless otherwise stated. Also, Plaintiff requests that the court strike Defendant's Statement of Uncontroverted Material Facts on the grounds that Defendant failed to comply with Rule 7 - 4.01E. Pl. Resp. Def. Facts at 1. Plaintiff's response demonstrates that Plaintiff was able to satisfactorily respond to Defendant's Statement of Uncontroverted Material Facts. As such, the court will deny Plaintiff's request to strike.

meeting with physicians and health care professionals to advise and educate them about Defendant's products.  Specifically, sales representatives are responsible for discussing drugs' indications with health care professionals.  A drug's indications include Federal Drug Administration ("FDA") uses for the drug, FDA approved regimens for the drug, potential side effects of the drug, and measures to take when a patient experiences a side effect from using Defendant's product.

The FDA restricts the types of materials that pharmaceutical sales representatives may provide to health care professionals.  Defendant's sales representatives are only permitted to provide health care professionals with literature that Defendant approves regarding medical studies concerning Defendant's products.  Defendant monitors the articles utilized by its sales representatives for promotional purposes to ensure that the articles communicate messages that adhere to the FDA rules and guidelines. Defendant's Copy Review Committee ("CRC") approves articles utilized by sales representatives.  If a health care professional asks a sales representative a question regarding an unapproved article, the sales representative is required to refer the health care professional to a Medical Liaison.  Also, sales representatives are not permitted to provide health care professionals with articles that have been highlighted regarding medical studies.  Further, it is against Defendant's policy for sales representatives to market Defendant's products by disclosing the difference between drug reimbursement rates and drug acquisition costs (the "Spread").  Defendant's Code of Business Conduct states, in relevant part, that "[a]ll materials distributed by or on behalf of [Defendant] that discuss our products (whether or not created by [Defendant]) must be reviewed and approved through a review process involving a variety of functional areas ... to ensure compliance with

applicable laws, regulations and company policies. Employees are forbidden to disseminate materials that have not been approved through this process ... ." Def. Facts, Ex. F at 4.[2]

In October 2001 Plaintiff joined Defendant as a sales representative with the title Oncology Account Manager in Defendant's Oncology Business Unit. In the fall of 2003, Plaintiff began to report to John Hamm. Mr. Hamm reported directly to Charles Yelverton, Regional Business Director for the Oncology Business. Mr. Yelverton reported to Lloyd Sanders, National Sales Director for the Oncology Business. During his employment with Defendant Plaintiff was responsible for selling and educating doctors regarding the drugs Eligard, Eloxatin, and Ambien.

Defendant contends, and Plaintiff denies, that in 2003 at a District Meeting Plaintiff advocated aggressively marketing the difference in the Spread for Defendant's products and the Spread for competitors' products; that Mr. Hamm discussed the prohibition regarding the Spread in response to Plaintiff's comments; and that Plaintiff shared with one of his accounts information regarding differences in the Spread for Defendant's products as compared to its competitors. Def. Facts, ¶ 26-27, 29; Pl. Resp. Def. Facts, ¶ ¶ 8-10 (citing Pl. Dep. at 142-49). Specifically, Plaintiff denies that he advocated selling based on the Spread and that he called one of his accounts in an effort to make a sale based on the Spread. Pl. Resp. Def. Facts, ¶ 10.

In December 2003 an unusually large order was placed for Eloxatin by the Siteman Cancer Center ("Siteman") and this order was delivered in that month. Plaintiff contends that Defendant wanted to treat the sale as a "2004 event," what Plaintiff describes as re-booking, and that Plaintiff did not "support the change." Plaintiff testified in his deposition as follows about the Siteman order: the first time the re-booking of the Siteman order was discussed with him was in early January 2004,

---

[2]     Plaintiff's assertion that Defendant's Code of Business Conduct does not address the distribution of unapproved articles to health care professionals is refuted by the above quoted provision of the Code. See Doc. 20 at 4.

which was two or three weeks after the Siteman order was placed with the wholesaler; Mr. Hamm

left Plaintiff a voice- mail message that Defendant wanted to consider re-booking the order to 2004;

Mr. Hamm said that "Charlie [Yelverton] is behind it and thinks it is the best thing for you to do for

your long term interest"; Mr. Hamm said that they would discuss the matter in a couple of weeks;

around January 20, 2004, Mr. Hamm told Plaintiff that he wanted Plaintiff to "data smooth" the

Siteman order; and Plaintiff's understanding of the meaning of data smoothing was that "the credit

and compensation provided to the sales representative would occur at a later date;" that Mr. Hamm

did not suggest to Plaintiff that the paperwork between Siteman and the vendor be altered in any way;

and that Mr. Hamm asked Plaintiff to retrieve a copy of the paperwork for the Siteman order so that

Mr. Hamm could forward it to Defendant's Head of Operations, Bruce Cellura.  Pl. Dep. at 117-24.

Plaintiff further testified in his deposition that several times in February 2004 he spoke with Mr.

Cellura at a national meeting; that during one of these conversations Mr. Cellura said, in reference

to the Siteman order,  that "we're were working on it."  Pl. Dep. at 126.  Plaintiff also testified that

at a dinner meeting in February 2004 he asked Mr. Cellura what the status of the Siteman order was;

that Mr. Cellura responded that they were "not going forward with it," that they were going to keep

it "as a 2003 event for all purposes," that to do otherwise was "illegal" and was "cooking the books,"

and that "it wouldn't be done"; and that after this conversation with Mr. Cellura Plaintiff never

discussed the matter "with Mr. Hamm or anyone else." Pl. Dep. at 134-136.   It is undisputed that

Defendant did not go through with the proposed change.

Defendant contends that what was proposed and subsequently rejected regarding the Siteman

order was that Plaintiff be given recognition for the sale over a period of months rather than in

December 2003 for purposes of giving him credit under a discretionary bonus plan.  Plaintiff admits

that Defendant's sales representatives do not book orders as Defendant typically sells drugs through

a drug wholesaler; it is the wholesalers who book the sales. Plaintiff also admits that had Plaintiff been credited with the full amount of the sale in December 2003, it would have increased his quota for 2004 making it difficult for him to qualify for a 2004 bonus.

In January 2004 Plaintiff provided an unapproved highlighted article to a health care professional. Defendant contends, and Plaintiff denies, that Mr. Hamm verbally warned Plaintiff regarding this conduct. Def. Facts, ¶ 19; Pl. Resp. Def. Facts, ¶ 19 (citing Pl. Answer to Def. Interrog. No. 1 at 4).

Defendant contends that in January 2004 Mr. Sanders, the National Sales Director for the Oncology Business, learned that Plaintiff provided to a clinic an unapproved article regarding the use of Eloxatin with an anti-depressant and that as a result the clinic prescribed the two drugs together. Defendant contends, and Plaintiff denies, that Plaintiff's use of an unapproved article in this regard violated Defendant's Code of Business Conduct. Plaintiff, however, does not deny that articles utilized by sales representatives must be approved by Defendant's CRC. Def. Facts, ¶ ¶ 14-16. Plaintiff contends that Mr. Sanders knew Plaintiff was distributing the article at issue and approved its use. Def. Facts, ¶ 22; Pl. Resp. Def. Facts, ¶ ¶ 3-4 (citing Pl. Answer to Def. Interrog. No. 1 at 2, 4). Plaintiff further contends that Mr. Hamm trained sales representatives regarding unapproved information and encouraged them to use it. Doc. at 15, ¶ 13.

Defendant contends, and Plaintiff denies, that Mr. Sanders contacted Mr. Yelverton and Rodney Vinegar, in Defendant's Human Resource Department, to express concern regarding Plaintiff's "pro-active distribution of the article"; that Mr. Yelverton discussed with Mr. Hamm whether to terminate Plaintiff for improper use of the article; that Mr. Hamm indicated that he did not want to terminate Plaintiff and requested the opportunity to coach Plaintiff regarding use of the article; that Defendant's management decided not to terminate Plaintiff and to give him a written

warning; and that Mr. Hamm discussed the matter with Plaintiff and Plaintiff stated that he understood that what he did was wrong. Def. Facts, ¶¶ 23-24. Plaintiff admits that on February 3, 2004, he received a warning letter regarding his distribution of unapproved information. The warning letter from Mr. Yelverton stated that it was important for Plaintiff to understand that violations of Defendant's Code of Conduct or other applicable Company policies and procedures may result in disciplinary action up to and including dismissal." Def. Facts, Ex. C at Ex. 1.

An incident report provided to Defendant stated that in March 2004, an employee of a doctor's office reported that Plaintiff was "rude and mean to her" and another employee reported that Plaintiff "banged on the glass in their office" and that "he [was] not welcome to set foot on their premises again." The incident report said that Plaintiff belittled and humiliated both individuals. In response to the incident report, Mr. Hamm contacted the doctor's office and the billing department to verify the report. Def. Facts, Ex. A, Hess Aff., ¶¶ 13-14, Ex. 2. Defendant contends, and Plaintiff denies, that when confronted regarding this incident Plaintiff admitted that he raised his voice and behaved inappropriately. Def. Facts, ¶¶ 31, 35; Pl. Resp. Def. Facts, ¶ 12. Plaintiff contends that he told Mr. Hamm that none of the allegations regarding the doctor's office were true. Pl. Resp. Def. Facts, ¶ 12 (citing Pl. Dep. at 211, 218-26). Mr. Hamm spoke with Mr. Yelverton regarding the incident report from the doctor's office and, in response to Mr. Yelverton's request, Mr. Hamm prepared a summary of his "thoughts regarding [Plaintiff's] conduct and overall performance." Def. Facts, Ex. A, Hess Aff., ¶ 15, Ex. 2, Ex. 3. In an e-mail, dated April 6, 2004, to Mr. Yelverton, Mr. Hamm referenced that in December 2003 during a break in a meeting wherein Mr. Hamm told the group not to sell based on the Spread, Plaintiff called one of his accounts and discussed the Spread; that in February 2004 Plaintiff was given a written reprimand for having "given an unapproved resource to an account"; that on March 31, 2004, women in a doctor's office were upset by Plaintiff's

behavior and one said that Plaintiff was not welcome in the doctor's office "ever again"; that Plaintiff "has a tendency to act before he thinks"; that on several occasions Plaintiff had shown disrespect for Mr. Hamm's direction, the FDA, and Defendant's upper level management; that "upon receiving his written reprimand at the end of February, [Plaintiff] used filthy language on two conference calls [Mr. Hamm] held"; that Plaintiff had used profanity; and that it was Mr. Hamm's belief that Plaintiff was a potential liability and that, therefore, he should be terminated. Def. Facts, Ex. J. In an e-mail dated April 13, 2004, Mr. Hamm told Mr. Yelverton that he had spent the last week reviewing the most recent complaint against Plaintiff and "the previous troublesome behavior on [Plaintiff's] part." Mr. Hamm summarized the events which he was addressing involving Plaintiff and stated that "all of these incidents exhibit [Plaintiff's] lack of good judgment." Def. Facts, Ex. L.

Plaintiff contends that these reasons for discharging him as stated in the e-mails are pretextual and that the real reason Defendant discharged him was for his refusal to participate in a scheme to re-book the Siteman order. Plaintiff further contends that the bookkeeping change would have violated 15 U.S.C. §77(a) et seq., 18 U.S.C. §§ 1001, 1035(a), 26 U.S.C. § 7206, and Mo. Rev. Stat. § § 351.215 and 144.490. Plaintiff contends that, therefore, his discharge by Defendant violates public policy.

Plaintiff became employed by Abraxis Oncology ("Abraxis") on May 19, 2004. On October 13, 2004, Abraxis placed Plaintiff on a thirty-day performance improvement plan ("PIP"). Specifically, in Plaintiff's Abraxis performance appraisal it was noted that: (1) Plaintiff was unable to effectively communicate Abraxis's science and technology to potential customers; (2) Plaintiff was taking no other measures, besides providing free lunches, to potential customers to attempt to obtain business; (3) Plaintiff displayed a lack of preparation with respect to managing his territory and interaction with customers; (4) Plaintiff inappropriately utilized company resources to provide large meals to potential

customers; (5) Plaintiff appeared to be somewhat confrontational and believed that his way was the only way; and (6) Plaintiff needed improvement in administrative skills. Def. Facts, Ex. M. Plaintiff was told that "failure to immediately correct these issues will result in disciplinary action up to and including termination of employment." Def. Facts, Ex. M. In his deposition Plaintiff testified that he disagreed with the comments regarding his communication skills and access to customers outside the lunchroom setting; that the matters addressed in the PIP were "not exactly fabricated" and "weren't made up"; and that "some things occurred." Pl. Dep. at 84-85.

On November 23, 2004, Abraxis terminated Plaintiff. Plaintiff's termination letter states that Plaintiff had been placed on a thirty-day development plan on October 13, 2004; that Abraxis had extended the thirty-day development plan through November 19, 2004; that during recent field visits it had been observed that Plaintiff had provided information in a manner which was contrary to Abraxis's corporate policy and which was against the law; and that, therefore, Plaintiff was being terminated. Def. Facts, Ex. N. Plaintiff contends that Abraxis did not terminate him for the reasons stated in the letter and that Abraxis had "no issue with his performance until Abraxis employees began receiving information from [Defendant] about [Plaintiff]." Pl. Resp. Def. Facts, ¶ 29. Plaintiff alleges that Defendant is liable for tortious interference with his employment as a result of Abraxis's terminating him.

In support of this claim Plaintiff contends that an Abraxis employee, Libby Gottsacker, told him that she "heard rumors about the reason he was no longer with Defendant." Doc. 20, Ex. 1 at 17, ¶24. Plaintiff testified in his deposition that Ms. Gottsacker told him that his termination from Abraxis was related to his discharge by Defendant; that Ms. Gottsacker told him that she spoke with someone who was an employee of Defendant; and that she did not give Plaintiff the name of the person with

whom she spoke. Pl. Dep. at 57, 59-61. In an affidavit[3] Ms. Gottsacker states that while she was an employee of Abraxis, prior to Plaintiff's being terminated by Abraxis, Franciscka Schuler, a sales representative employed by Defendant, told her that Plaintiff was terminated by Defendant because he used an unapproved clinical article in the promotion of Defendant's product; that Ms. Gottsacker communicated this information to Debbie Mercer, an employee of Abraxis, who was a sales specialist; and that Ms. Mercer told Ms. Gottsacker that she, in turn, communicated this information to Plaintiff's immediate supervisor at Abraxis, Tom Inman.

## STANDARD FOR SUMMARY JUDGMENT

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn.

_____

[3]  Plaintiff filed a motion to supplement his Memorandum in Opposition to the Motion for Summary Judgment with Ms. Gottsacker's affidavit. Doc. 25. Defendant opposed Plaintiff's Motion on the grounds that it was untimely, that its admission after the close of discovery would prejudice Defendant, and that it included inadmissible hearsay. Doc. 26. Defendant argued, in the alternative, that even considering Ms. Gottsacker's affidavit summary judgment should be granted in Defendant's favor. While Defendant's position regarding the admissibility of the affidavit is well placed, because the court concludes, as discussed below, that the admission of the affidavit does not effect the outcome of Defendant's Motion for Summary Judgment, the court will consider Ms. Gottsacker's affidavit and grant Plaintiff's Motion to Supplement the Memorandum in Opposition to the Motion for Summary Judgment.

& E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of Defendants' motions.

## LEGAL FRAMEWORK and DISCUSSION

### A.  Count I - Plaintiff's Claim for Wrongful Discharge by Defendant:

Pursuant to Missouri law, an employer can discharge an employee "at any time, with or without cause." Scott v. Missouri Valley Physicians, P.C., 460 F.3d 968, 970 (8th Cir. 2006) (citing Luethans v. Washington Univ., 894 S.W.2d 169, 172 (Mo.1995)). Missouri courts, however, have recognized a public policy exception to the at-will doctrine and have further "recognized four types of cases under this exception." Scott, 460 F.3d at 970 (citing Faust v. Ryder Commercial Leasing &

Servs., 954 S.W.2d 383, 389 (Mo. Ct. App.1997)). These cases include "1) discharge due to a refusal to perform an illegal act; 2) discharge based on an employee's act of reporting violations of law or public policy to superiors or public authorities; 3) discharge based on an employee's participation in acts encouraged by public policy, such as jury duty; and 4) discharge because an employee filed a worker's compensation claim. " Id. (citing Faust, 954 S.W.2d at 390). Plaintiff brings his cause of action pursuant to the first exception to the at-will doctrine made for employees who refuse to perform an illegal act.[4]

Under the first public policy exception to the at-will doctrine Plaintiff must establish that Defendant *asked him to perform an illegal act,* that he *refused to do so, and that he was discharged for the failure to do so.* Dunn v. Enterprise Rent-A-Car Co., 170 S.W.3d 1, 7 (Mo. Ct. App. 2005) ("[T]he plaintiff must demonstrate the 'conduct required of him by the employer would have amounted to a violation of a statute, constitutional provision or regulation ..., and also that his discharge was attributable to a refusal to perform the unlawful act.") (quoting Crockett v. Mid-America Health Servs., 780 S.W.2d 656, 658 (Mo. Ct. App. 1989)). See also Lay v. St. Louis Helicopter Airways,

---

[4]     In its Motion for Summary Judgment Defendant argues that Plaintiff cannot meet the second exception to the at-will doctrine which is based on an employee's reporting violations of public law or policy. In Response to the Motion to Summary Judgment Plaintiff clarifies that this is not the exception which he contends is applicable to him. He contends, rather, that it is the first exception upon which he basis his claim of wrongful discharge. Doc. 22 at 6 ("Mr. Hess did not allege that his discharge met this second public policy exception but that it met the first."). As such, the court has not addressed whether Plaintiff was discharged in violation of the second exception. The court notes, however, that Plaintiff acknowledges that he did not complain to anyone other than those supervisors who were involved in the alleged wrongdoing. Under such circumstances, Plaintiff cannot establish that he was discharged in violation of the whistleblowing exception to the at-will doctrine. See Scott v. Missouri Valley Physicians, P.C., 460 F.3d 968, 970 (8th Cir. 2006) (citing Faust v. Ryder Commercial Leasing & Servs., 954 S.W.2d 383, 389 (Mo. Ct. Ap. 1997) ("[R]eporting wrongdoing to the wrongdoer, who is the purported whistleblower's supervisor, does not constitute internal whistleblowing sufficient to support a claim of wrongful, retaliatory discharge under the public policy exception.").

11

869 S.W.2d 173, 176 (Mo. Ct. App.1993); <u>Boyle v. Vista Eyewear</u>, 700 S.W.2d 859, 873 (Mo. Ct. App.1985).

In regard to the requirement that Defendant asked Plaintiff to perform an act, it is undisputed that Plaintiff did not have any control over whether Defendant would "smooth the data"; that the decision to smooth the data would be made by Defendant, not the sales representatives and managers whose compensation and quota would be effected by the treatment of the sale; that ultimately the decision was made not to smooth the data from the Siteman order; and that the Siteman order was fully credited to Plaintiff for the purpose of calculating his discretionary bonus compensation in December 2003. Def. Facts, ¶ 69; Pl. Resp. to Def. Facts, ¶ 23.  Further, while Plaintiff states that he was asked to obtain a copy of the Siteman order, in the context of the undisputed facts of this case, obtaining a copy of a document which was otherwise readily obtainable by Defendant is not *performing an illegal act* for purposes of the first public policy exception to the at-will employment doctrine.

Plaintiff relies on <u>Dunn</u>, 170 S.W.3d at 7, to support his claim that was asked to perform an illegal act and that, therefore, his discharge is in violation of the public policy exception to the at-will employment doctrine.  <u>Dunn</u>, however, is distinguishable as the plaintiff in that case "refused to comply with [his employer's] instructions to use improper accounting methods" and he was actually "directed to use [these methods] in financial statements related" to his employer's initial public offering ("IPO") which "were not in accordance with" generally accepted accounting principles ("GAAP"). 170 S.W.3d at 7.  Significantly, the plaintiff in <u>Dunn</u> was the defendant's corporate comptroller and chief accountant and was responsible in this capacity for preparing financial statements, while Plaintiff in the matter under consideration is a sales representative with no authority to make accounting changes.  Moreover, it is undisputed that the change which Defendant considered had nothing to do

with reporting income. Rather, it was related only to the manner in which Plaintiff's bonuses would be calculated. As such, not only has Plaintiff failed to suggest *an act* which Defendant asked and/or he refused to perform, but he has not suggested how changing the manner in which Plaintiff's bonus was calculated could have *violated any law or public policy*.

Plaintiff alleges in his Complaint that "Mr. Hamm asked him to consider taking the Siteman order booked in December 2003 and applying it to Plaintiff's sales data for the first quarter of 2004" and that he refused to do so because it was an illegal practice. Doc. 1, ¶¶ 11, 13. Plaintiff contends that he need not establish that the act which an employee refuses to perrform for purposes of the first policy exception is actually illegal or against public policy. Plaintiff is required, however, to show that there is "some legal authority for his belief that" the conduct in which he allegedly refused to engage "was unlawful or contrary to a clear mandate of public policy." <u>Dunn</u>, 170 S.W.2d at 11. First, as stated above, the undisputed facts do not establish that Plaintiff was asked to perform an act other than to retrieve a copy of the Siteman order and/or accept the bonus. Even assuming, arguendo, that Plaintiff was asked to participate in the smoothing of the Siteman order, Plaintiff has suggested no legal authority to support his claim that he could have even had a reasonable belief that either his retrieving a copy of the Siteman order or the smoothing of that order was illegal or against public policy. Under such circumstances, the court finds that the undisputed facts establish that Plaintiff was not asked to perform or to participate in an "act," let alone an illegal act or one against public policy; that he did not have a reasonable belief that the act which he allegedly was asked to perform or in which he was asked to participate was illegal or against public policy; and that he did not refuse to perform or participate in an illegal act or an act against public policy. As such, Plaintiff's cause of action pursuant to the first public policy exception to the at-will doctrine must fail. <u>See</u> <u>Dunn</u>, 170 S.W.3d at 7; <u>Lay</u>, 869 S.W.2d at 176; <u>Boyle</u>, 700 S.W.2d at 873

Additionally, a claim of wrongful discharge must be supported by some evidence of a causal connection between an employer's termination decision and an employee's protected conduct, in this case Plaintiff's refusing to participate in the smoothing of the Siteman order. See Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir. 2005). ("To establish a prima facie case of retaliation [in the employment context], a plaintiff must show that she engaged in statutorily protected activity, suffered an adverse employment action, and that there was a causal connection between the adverse employment action and the protected activity.") (citations omitted); Jackson v. St. Joseph State Hosp., 840 F.2d 1387, 1390 (8th Cir. 1988). Indeed, a short interval between a plaintiff's protected activity and an adverse employment action may suggest an inference of causation, although, "in general, more than a temporal connection is required to present a genuine factual issue on retaliation." Peterson, 406 F.3d at 524. On the other hand, a long interval between a plaintiff's protected activity and his discharge suggests that the plaintiff's discharge was not related to his alleged protected activity. Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 503 (8th Cir. 2005) (quoting Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 633 (8th Cir.2005) ("A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive.") and (quoting Shanklin v. Fitzgerald, 397 F.3d 596, 604 (8th Cir. 2005) (holding the plaintiff failed to establish a causal connection where ten months elapsed between the plaintiff's discrimination charge and her subsequent discharge). In the matter under consideration, Plaintiff allegedly refused to perform or participate in an act which he contends violated the law and/or public policy in mid January 2004, yet he was not discharged until April 28, 2004, a period of approximately three months. This temporal lack of proximity suggests that there is no nexus between Plaintiff's alleged protected activity and his discharge.

Even where there is temporal proximity between alleged protected activity and an employee's termination, "the presence of intervening events undermines any causal inference that a reasonable person might otherwise have drawn from temporal proximity." Freeman v. Ace Telephone Ass'n, 467 F.3d 695, 698 (8th Cir. 2006) (citing Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). In Plaintiff's case, during the intervening months between Plaintiff's alleged protected activity and his discharge, Defendant documented two incidents involving conduct which it suggests warranted his discharge. As set forth in detail above, it is undisputed that Defendant learned in January 2004 that Plaintiff distributed the unapproved article involving Eloxatin and an anti-depressant; that this conduct violated Defendant's Code of Business Conduct; and that Plaintiff subsequently received a written warning regarding the distribution of the article. It is further undisputed that in March 2004 women working in a doctor's office were upset by Plaintiff's conduct and that their dissatisfaction was reported to Defendant, although Plaintiff contends that his conduct was not accurately described by the women. These intervening acts undermine Plaintiff's argument that Defendant discharged him in April 2004 for refusing to engage or participate in an illegal act or an act against pubic policy in January 2004.

Plaintiff argues that evidence of pretext is provided by his not receiving a warning letter regarding his use of a highlighted article until after his alleged refusal to engage and/or participate in an illegal act in January 2004. Plaintiff, however, does not deny that Mr. Hamm witnessed Plaintiff provide an unapproved highlighted article to a health care professional in January 2004. Def. Facts, ¶ 19; Pl. Resp. Def. Facts, ¶ 1. The court finds that the undisputed facts establish that the reasons given for Plaintiff's discharge are not a pretext for discharging Plaintiff for his refusal to engage or participate in an allegedly unlawful act as there is no nexus between Plaintiff's alleged refusal and his discharge, as approximately three months transpired between Plaintiff's alleged refusal and his

discharge, as Plaintiff does not deny that he improperly used a highlighted article in January 2004, as

he does not deny that he improperly used the Eloxatin article in January 2004, as in February 2004 he

was warned about his use of these articles and that such use violated Defendant's Code of Conduct,

and as, subsequent to Plaintiff's being warned in February 2004, Defendant received an incident report

from a doctor's office regarding Plaintiff's alleged conduct despite the fact that Plaintiff disputes its

accuracy.  Further, the court finds that the undisputed facts establish that there is *no evidence* of any

causal relationship between Plaintiff's allegedly refusing to engage or participate in an illegal act or

act against public policy and his discharge. [5]

Moreover, even assuming, arguendo, that Defendant's stated reasons for discharging Plaintiff

are not the real reasons it discharged Plaintiff, the undisputed facts establish that the real reason was

not Plaintiff's refusing to engage or participate in an illegal act or an act against public policy.  See

Hicks v. St. Mary's Honor Ctr., 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a

pretext for discrimination' unless it is shown both that the reason was false, and that discrimination

was the real reason."); Stuart v. Gen. Motors Corp., 217 F.3d 621, 633 (8th Cir. 2000) (holding that

"merely disputing" an employer's proffered nondiscriminatory reason for an adverse employment

action is insufficient to establish unlawful discrimination; an employee claiming unlawful discrimination

must show both that the stated reasons for the adverse employment action was false and that the "real

reason" was unlawful)  (citing Ryther v. KARE 11, 108 F.3d 832, 838 n.5 (8th Cir.1997) (en banc);

Rothmeier v. Inv. Advisors, Inc., 85 F.3d 1328, 1333 (8th Cir. 1996) (holding that an employee

---

[5]        Plaintiff notes that Missouri courts of appeal disagree on whether there must be
exclusive or partial causation in order to prevail on a cause of action for wrongful discharge.
Doc. 20 at 6 (citing Brenneke v. Dep't of Missouri, 984 S.W.2d 134, 139-41 (Mo. Ct. App.
1998) (rejecting exclusive causation as the proper burden of proof); Lynch v. Blanke Baer &
Bowey Krimko, Inc., 901 S.W.2d 147 (Mo. Ct. App. 1995) (requiring proof of exclusive
causation).  This distinction, however, is not relevant in the matter under consideration as the
court has found above that there is absolutely no evidence of causation.

claiming pretext must show not only pretext but that the real reason for an adverse employment action was intentional discrimination).  Therefore, while there are disputed facts relevant to the reasons Defendant discharged Plaintiff, such as whether Plaintiff banged on a window in a doctor's office, whether Plaintiff was rude to an employee in a doctor's office, whether Mr. Hamm verbally warned Plaintiff regarding his use of a highlighted article, and whether Mr. Sanders approved of Plaintiff's use of the unapproved Eloxatin article, these disputed facts are not material to Plaintiff's cause of action. See Celotex, 477 U.S. at 322.

In summary, the court finds that the undisputed facts establish that Plaintiff was not *asked to perform* or *participate in an illegal act* or *an act against public policy* in furtherance of Defendant's aborted plan to give Plaintiff recognition for the Siteman order over a period of months; that Plaintiff did not have a reasonable basis to believe that he was asked to perform or participate in an illegal act or an act against public policy; that Plaintiff did not *refuse to perform* or *participate in an illegal act* or *an act against public policy*; and that Plaintiff was *not discharged for* such a *refusal*.  In fact, Plaintiff has failed to present *any* evidence to support his claim that he was discharged by Defendant because he refused to perform or participate in an illegal act. See Peterson, 406 F.3d at 524; Freeman, 467 F.3d at 698; Dunn, 170 S.W.3d at 11.  As such, the court finds that summary judgment should be granted in favor of Defendant in regard to Count I of Plaintiff's Complaint.

**B.      Count II, Tortious Interference - Plaintiff's Discharge By Abraxis:**

In Count II of his Complaint, Plaintiff alleges that Defendant engaged in tortious interference with his business relationship and that as a result he was terminated by Abraxis.  Plaintiff further alleges that at various times after he was hired by Abraxis, Defendant communicated with employees of Abraxis and made "disparaging false statements of fact about Plaintiff"; that as a result Abraxis

discharged Plaintiff; that Defendant's statements were defamatory[6]; and that as a result of Defendant's conduct Plaintiff has suffered damages.

Tortious interference involves a plaintiff's attempt to recover from a third-party on the grounds that the third party induced another not to enter into or continue a business relationship with the plaintiff. Restatement of Torts, § 766; State of Missouri v. Nat'l Org. for Women, Inc., 467 F.Supp. 289, 305 (W.D. Mo. 1979). Missouri law recognizes a cause of action for tortious interference with contractual relations. See e.g., Synergetics Inc. v. Hurst, Slip Op. 06-1146 at 13 (8th Cir. Feb. 5, 2007) (citing Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. 1996) (en banc)); Superturf, Inc. v. Monsanto Co., 660 F.2d 1275, 1284 (8th Cir.1981); City of Warrensburg v. RCA Corp., 550 F.Supp. 1364, 1380 (W.D. Mo.1982); Downey, et al. v. United Weatherproofing, 363 Mo. 852, 253 S.W.2d 976 (Mo.1953)). To establish such a cause of action for tortious interference Missouri law requires that a plaintiff establish the following:

1. Existence of a contract or valid business relationship or expectancy;

2. Knowledge of the relationship or expectancy on the part of the defendant;

---

[6]     Plaintiff does not allege a separate claim for defamation although he contends in Count II, for tortious interference, that Defendant's alleged statements were defamatory. To defame in the legal sense, according to Missouri law, "'is to speak evil of one maliciously, to dishonor, to render infamous.'" Morton v. Hearst Corp., 779 S.W.2d 268, 271 (Mo. Ct. App. 1989) (quoting Brown v. Kitterman, 443 S.W.2d 146, 149 (Mo.1969) (internal quotation omitted). Further, under Missouri law, "[t]he initial determination of whether the statement is capable of a defamatory meaning rests with the court as a question of law." Id. (citing Brown, 443 S.W.2d at 150). "[In] determining whether the statements are defamatory, the court must consider them, not in isolation, but in the context of the entire publication." Id. at 271-72 (citing Buller v. Pulitzer Publ'n Co., 684 S.W.2d 473, 477 (Mo. Ct. App.1984)). In particular, under Missouri law a statement which does not "enhance the career" of an individual or a statement regarding the reason[s] one has lost his or her job does not necessarily implicate defamation. See id. at 272. To the extent Plaintiff contends that Defendant defamed him, the court finds that the undisputed facts do not establish that Plaintiff was defamed; Plaintiff has failed to suggest or attribute statements to Defendant which as a matter of law are defamatory. See Morton, 779 S.W.2d at 271.

3. An intentional interference inducing or causing a breach of termination of the relationship or expectancy;

4. The absence of justification; and

5. Resulting damages to the party whose expectancy has been disrupted.

Superturf, 660 F.2d at 1284; City of Warrensburg, 550 F.Supp. at 1380.

The "absence of justification" element of a cause of action for tortious interference with a business relationship is established when "[o]ne acts without justification when he maliciously interferes with another's contract or business relations.'" Id. at 1381 (citing Gerstner Elec., Inc. v. American Insurance Co., 520 F.2d 790, 794 (8th Cir.1975) ("To recover in Missouri on a claim for wrongful interference ... there must be proof that the defendant no only intended to commit an act which is ascertained to be wrongful but also that he knew it was wrongful at the time he did it."); C & M Developers, Inc. v. Berbiglia, Inc., 585 S.W.2d 176, 184 (Mo. Ct. App.1979) ("[U]nder Missouri law absence of justification is equatable with malicious interference."). A jury issue is created in a claim of tortious interference only where there is evidence "sufficient to warrant a finding of legal malice, which, under Missouri authorities, is the intentional doing of a wrongful act without justification or excuse." Gerstner, 520 F.2d at 795.

First, it is undisputed that in October 2004, Abraxis placed Plaintiff on a thirty day PIP based on the reasons articulated above. While Plaintiff disputes the accuracy of the basis for the Abraxis PIP, he acknowledges that it had some merit.

Second, Plaintiff clearly has not suggested direct evidence that he was discharged from Abraxis because of any conduct on the part of Defendant. In the event a plaintiff cannot provide direct evidence regarding the reason for his discharge, "the [c]ourt must determine whether plaintiff has provided sufficient circumstantial evidence to survive defendant's motion for summary judgment." Rogic v. Mallinckrodt Med., Inc., 917 F. Supp. 671, 676 (E.D. Mo. 1996) (citing Nitschke v.

McDonnell Douglas Corp., 68 F.3d 249, 251 (8th Cir.1995)). Indeed, the mere fact that Plaintiff was discharged by Abraxis creates no presumption that he was discharged as a result of any conduct on the part of Defendant. See Osceola County Co-op, Creamery Ass'n v. NLRB, 251 F.2d 62, 69 (8th Cir. 1957) (quoting NLRB v. McGahey, 233 F.2d 406, 413 (5th Cir. 1956) ("With discharge of employees a normal, lawful legitimate exercise of the prerogative of free management in a free society, the fact of discharge creates no presumption, nor does it furnish the inference that an illegal- not a proper- motive was its cause. An unlawful purpose is not lightly to be inferred.").

Plaintiff contends that he is entitled to an inference that questions about his performance at Abraxis were not raised until "one or more of Defendant's employees contacted one or more of Abraxzis's employees and gave false information about [Plaintiff]." Pl. Resp. Def. Facts, ¶ 24. Based only on Ms. Gottsacker's affidavit Plaintiff asks the court to infer a link between his termination and Defendant's allegedly providing Abraxis with false information. Plaintiff suggests that it should be inferred that he was discharged by Abraxis because Defendant's sales representaive, Ms. Schuler, told Ms. Gottsacker, an Abraxis employee, that Plaintiff was discharged by Defendant because he used an unapproved clinical article and because this information was conveyed to another Abraxis employee who in turn conveyed it to Plaintiff's Abraxis supervisor.

Ms. Gottsacker's affidavit does not provide any suggestion that Plaintiff was discharged by Abraxis as a result of the information initially conveyed by Defendant's sales representative; the affidavit suggests nothing more than Mr. Inman's being aware that Plaintiff was discharged by Defendant for using an unapproved article. Further, Ms. Gottsacker's affidavit does not suggest that the information conveyed to her by Ms. Schuler, Defendant's employee, was intended to result in

Plaintiff's termination by Abraxis.[7]  Indeed, Ms. Schuler's statement to Ms. Gottsacker, Ms. Gottsacker's statement to Ms. Mercer, and Ms. Mercer's statement to Mr. Inman, represent nothing more than gossip.  There is no evidence before this court to suggest that Plaintiff was terminated by Abraxis for reasons other than those stated in his termination letter.  As such, Ms. Gottsacker's statements as portrayed by Plaintiff in his deposition and/or as stated in Ms. Gottsacker's affidavit do not provide a nexus between Plaintiff's discharge by Defendant and his discharge by Abraxis; they do not provide a nexus between the statements attributed to Ms. Schuler and Plaintiff's discharge by Abraxis; they do not provide any evidence that Defendant caused or did anything to bring about Plaintiff's termination by Abraxis; they do not suggest intent on Defendant's part to induce or cause Abraxis to discharge Plaintiff. As such, Ms. Gottsacker's statements do not establish the elements of a cause of action for tortious interference.  See Superturf, 660 F.2d at 1284; City of Warrensburg, 550 F.Supp. at 1380.  Most significantly, the assertions which Plaintiff makes regarding his tortious interference claim represent nothing more than speculation which is insufficient to establish tortious interference on the part of Defendant.  See Rogic, 917 F. Supp. at 676 (holding that the party opposing summary judgment "may not rest on its pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion").

Because Plaintiff only provides supposition to support his claim of tortious interference, because Ms. Gottsacker's affidavit and the statements attributed to her by Plaintiff in his deposition fail to establish the elements of a cause of action for tortious interference, and because Plaintiff does

---

[7]     As such, the court need not address whether statements made by Ms. Schuler, who was not in management, could even be attributed to Defendant. See e.g., Sowers v. Howard, 139 S.W.2d 897, 902 (Mo. 1940) ("'If it be shown at the time the negligent act in question was committed, the servant, though using the instrumentalities of the master, with or without the master's consent, is doing so for his own purpose and in pursuit of his own business or pleasure, the master is not liable.'") (quoting Byrnes v. Poplar Bluff Printing Co., 74 S.W.2d 20, 23 (Mo. 1934).

not refute at least some of the conduct attributed to him by Abraxis, the court finds that the circumstantial evidence provided by Plaintiff is insufficient to withstand summary judgment in regard to Plaintiff's cause of action against Defendant for tortious interference; the undisputed facts establish that Defendant did not intentionally interfere with Plaintiff's business relationship with Abraxis. <u>See</u> <u>Superturf</u>, 660 F.2d at 1284; <u>City of Warrensburg</u>, 550 F. Supp. at 1380. As such, the court finds that summary judgment should be granted in Defendant's favor in regard to Count II of Plaintiff's Complaint.

## CONCLUSION

For the reasons more fully set forth above, the court finds that there are no genuine issues of material fact; that the undisputed facts establish that Plaintiff was not discharged by Defendant in violation of public policy as alleged in Count I of Plaintiff's Complaint; and that the undisputed facts establish that Defendant did not tortiously interfere with Plaintiff's business relationship with Abraxis as alleged in Count II of Plaintiff's Complaint. The court finds, therefore, that summary judgment should be granted in Defendant's favor.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Phillip A. Hess's Motion to Supplement Memorandum in Opposition to Motion for Summary Judgment is **GRANTED**; Doc. 25

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Defendant Sanofi-Synthelabo Inc. is **GRANTED**; Doc. 16

**IT IS FURTHER ORDERED** that a separate Judgment shall issue this same date incorporating this Memorandum Opinion.

/s/ Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of February, 2007.